UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOAO ARLINDO ORNELAS DEBARROS,

        Plaintiff,                Case No. 2:19-cv-10071
                                    Hon. Victoria A. Roberts
                                    Mag. Judge: Anthony P. Patti

GENERAL MOTORS, LLC,

        Defendant.

                                                              /

| | |
|---|---|
| Edward L. Ewald, Jr. (P43751) <br> LEMON LAW GROUP PARTNERS, PLC <br> Attorneys for Plaintiff <br> 48660 Pontiac Trail, #930792 <br> Wixom, MI 48393 <br> (313) 510-3329 <br> Fax (248) 856-2247 <br> edwardewald@comcast.net | Daniel J. LaCombe (P38602) <br> BARRIS, SOTT, DENN, DRIKER, PLLC <br> Co-Counsel for Defendant <br> 333 W Fort Street, Ste 1200 <br> Detroit, MI 48226 <br> (313) 965-9725 <br> Fax (313) 965-2493 <br> dlacome@bsdd.com |
| | Kathleen Taylor Sooy <br> April N. Ross <br> CROWELL & MORNING, PLC <br> Co-Counsel for Defendant <br> 1001 E Pennsylvania Avenue NW <br> Washington, DC 20004 <br> (202) 264-2687 <br> Fax (202) 628-5116 <br> ksooy@crowell.com <br> aross@crowell.com |

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

*Page*

NATURE OF THE CASE ........................................................................... 1

JURISDICTION AND VENUE ................................................................. 2

THE PARTIES ........................................................................................... 3

FACTUAL BACKGROUND ..................................................................... 4

COUNT I, BREACH OF EXPRESS WARRANTY ................................. 10

COUNT II, BREACH OF IMPLIED WARRANTY ................................ 12

COUNT III, VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT ............... 13

COUNT IV, UNJUST ENRICHMENT/OPPORTUNISTIC BREACH OF CONTRACT . 14

PRAYER FOR RELIEF ........................................................................... 18

JURY DEMAND ...................................................................................... 19

## FIRST AMENDED COMPLAINT

Now Comes Plaintiff, Joao Orlindo Ornelas DeBarros ("Mr. DeBarros"), and complains for monetary and equitable relief, from the Honorable Court, as follows:

## INDIVIDUAL ACTION

1.     Mr. DeBarros brings this case, on his own behalf only, because he purchased a 2015 Chevrolet Corvette Z06 ("Z06" or "Subject Vehicle") that proved to be defective.  Under the terms of the warranty provided by Defendant General Motors LLC ("GM" or "Manufacturer"), Mr. DeBarros sought to have those defects repaired or the Subject Vehicle replaced.  GM failed in its obligations to repair or replace the Subject Vehicle.  Because GM failed in its contractual and statutory obligations to Plaintiff, he brings this action to obtain declaratory and injunctive relief, incidental and consequential damages (including compensatory, statutory, exemplary and punitive damages), costs of suit, attorneys' fees and other appropriate relief.

## NATURE OF THE CASE

2.     In the 21st century, American car consumers expect that a new car will perform as advertised.  They have this expectation because car manufacturers provide written warranties with their vehicles that guarantee that the vehicle will be of a certain quality or it will be repaired.  These expectations are bolstered by federal and state laws that grant consumers rights of action if the manufacturer fails to live up to its advertisements or its warranties.

3.     This case arises from GM's failure to live up to its advertisements or its warranties.  Because GM has not honored its words or its guarantees, in this action, Plaintiff brings claims for breach of express warranty, breach of implied warranty, violations of the Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*., violations of the

Georgia Fair Business Practices Act ("FBPA"), O.C.G.A. 10-1-390, *et seq*., and unjust enrichment by virtue of opportunistic breach of contract.

4.      For these breaches and violations, Plaintiff asks the Court to declare Plaintiff's Z06 to be defective, order GM to repurchase the Z06, grant the Plaintiff his incidental and consequential damages, and impose statutory damages on the Defendant. In addition, because GM did not comply with federal and Georgia law, Plaintiff ask this Court to order GM to pay the costs of this suit, including his attorneys' fees.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action for damages which, in the aggregate, exceeds $121,999.53 exclusive of interest, costs and attorneys' fees.

6.      The United States District Court for the Northern District of Georgia has personal jurisdiction over GM because, while its principal place of business is in Michigan, it has had sufficient minimum contacts with Georgia, is registered to do business in Georgia, conducts substantial business in Georgia, has had systematic and continuous contacts within Georgia, and has agents and representatives that can be found in Georgia.

7.      Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Northern District of Georgia because the actions, transactions, and events that form the basis for this action occurred in Cobb County, Georgia and the harm to the Plaintiff was felt in Cobb County, Georgia.

8.      Plaintiff filed his original complaint in the Superior Court for Cobb County, Georgia. Defendant GM removed this case to the United States District Court for the Northern District of Georgia on the dual bases of subject matter jurisdiction and diversity. Defendant

GM then moved to transfer this case to the United States District Court for the Eastern District of Michigan.

9.      It will be a great hardship for the Plaintiff to attend a trial in the Eastern District of Michigan.  Indeed, the Subject Vehicle, the GM authorized dealerships who serviced the Subject Vehicle, and the technicians who attempted to repair the Subject Vehicle all reside in Georgia.  In other words, a significant number of witnesses with relevant, non-duplicative knowledge reside in the Northern District of Georgia.

10.      The proper venue to try this matter is the Northern District of Georgia.

## THE PARTIES

### *Joao Arlindo Ornelas DeBarros*

11.      Plaintiff Joao Arlindo Ornela DeBarros is a resident of Georgia, domiciled at 1932 Lenora Drive, Kennesaw, Georgia.  Mr. DeBarros is the purchaser and owner of the 2015 Chevrolet Corvette Z06 ("Z06" or "Subject Vehicle"), with the VIN 1G1YU2D60F5605660, that is the subject of this litigation.  On April 25, 2015, Mr. DeBarros purchased the Z06 from Rick Hendrick Chevrolet, an authorized GM dealership located in Duluth, Georgia, for $121, 999.53.

12.      Mr. DeBarros purchased the Z06 with a Z07 track package for his own personal use, subject GM's warranties.  Plaintiff made this purchase with the understanding that GM had advertised that the Subject Vehicle was "the most capable model in the iconic car's 62-year history."  He expected that the Z06 perform in line with these representations.  If he had known that the Z06 would not perform as advertised, or it would suffer from defects that would substantially impair the safety or value of the Subject Vehicle, he would not have purchased it or paid less for it.

3

### *General Motors LLC.*

13.     Defendant General Motors LLC ("GM") was formed under the laws of the State of Delaware operates its principal place of business in Dearborn, Michigan.  GM markets and sells automobiles, including the Subject Vehicle, in the State of Georgia.

## FACTUAL BACKGROUND

### *The Z06 Overheats*

14.     GM designed, manufactured, and advertised the Z06 to be an extraordinary car. In promotional material, GM claimed that it was "[a] driver's car with no equal."  Further, GM represented that the "Z06 [was] a true world-class supercar . . . featur[ing] a supercharged 6.2L aluminum V8 engine delivering 650 horsepower and 650 lb-ft of torque."  Instead, the vehicle Plaintiff received overheated during normal driving conditions, causing the car to operate at significantly reduced speeds, and imperiling Plaintiff's safety.

15.     Prior to offering any Z06 for sale, GM put the model through extensive testing. Although it discovered issues with the model's cooling system, it persisted in marketing and selling the vehicle as if they did not exist.  Instead, GM called "the 2015 Corvette Z06 the most powerful production car ever from General Motors and one of the most powerful production cars available in the United States."

16.     The Z06 was represented to be a car that could handle the stresses of everyday driving.  The Z06's transmission system takes the power generated by the Z06's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears. Slower, or lower, gears are used to slow down the output speed of the engine and increase torque. Higher gears increase the output speed and decrease torque. Due to the power generated by its engine, the transmission system for Z06s

4

comes equipped with certain features, such as transmission coolers, to cope with the high engine speeds and fast, frequent gear shifts. Without these features, the transmission systems in Z06s, for example, will overheat, causing the vehicle to go into Limp Mode. Limp Mode refers to a scenario where, to prevent damage, a Z06 automatically regresses to a lower revolutions per minute ("RPM") with a drastically slower speed, much to the surprise of the individual driver and those driving nearby.

17.     GM advertised special measures designed to properly cool the vehicle. For instance, marketing material explained that "the mesh pattern on the front fascia was painstakingly designed to deliver the most possible airflow to the supercharger's intercooler heat exchanger, so much so that the mesh grill directs more air into the engine bay than if the grill was removed." Further, it noted that "[a]dditional cooling elements include larger frond fender vents and unique air blades over the inlets on the rear fenders of Coupe models". Despite these representations, the Z06 purchased by Plaintiff repeatedly overheated.

18.     When the Z06 overheats, it immediately loses speed and power. This unexpected transition, can cause a driver to become disoriented and lose control, greatly increasing the risk of accident. Further, this sudden, unexpected transition, puts other drivers at risk as well, who cannot be expected to anticipate a vehicle to rapidly decelerate in highway speed traffic. Beyond merely reducing power, the failure of the cooling system can damage other components including the engine, clutch, and other parts.

19.     In 2016, GM acknowledged that the Z06's cooling system could be defective. It changed the design of the 2017 model year Z06 to incorporate a new hood, with larger vents, and a new supercharge cover. However, GM has failed to make any changes to the Subject Vehicle to address its issues.

20.     Rather, during one service visit, Plaintiff was referred to GM Service Bulletin PIP5311C.  PIP5311C states that the Z06 "is designed to keep engine oil, coolant, transmission and differential fluids below the hot warning targets when driving . . . on a 30[°]C day (86[°]F) . . . for an indefinite period of time (effectively the time to burn through a full tank of fuel)."  GM, *Service Bulletin No. PIP5311C*, October, 2016, https://static.nhtsa.gov/odi/tsbs/2016/MC-10119072-9999.pdf.  The Service Bulletin goes on to state that GM's "team validates the durability of the Z06 cooling systems with a 24hr accumulated track test to simulate the most aggressive track-day usage by our customers."  *Id*.

21.     In other words, GM maintains that a Z06 of average quality should be able to run through the exhaustion of its fuel supply under normal driving conditions, in 86°F weather, without overheating.  As described in greater detail herein, based on GM's own standard, Plaintiff's Z06 is defective.

### *Plaintiff's Purchase*

22.     Plaintiff purchased his Z06 on April 24, 2015.  Attached to this Complaint as Exhibit "A" is a copy of the Purchase Agreement.  Plaintiff incorporates it into this Complaint by reference.  The full purchase price was $121, 999.53.  Plaintiff's Z06 came with the Z07 track package, which GM represented would increase the performance of the Subject Vehicle.

23.     Plaintiff purchased the Subject Vehicle from Rick Hendrick Chevrolet, an authorized GM dealership located in Duluth, Georgia, for his own private, personal use.

24.     At the time of purchase, the Subject Vehicle was accompanied by a written warranty which provided bumper-to-bumper coverage for a period of three (3) years or 36,000 miles and powertrain coverage for five (5) years or 100,000 miles. This warranty extends to any repair or replacements needed during these periods or due to defects in materials or

workmanship.

25.     At the time of Plaintiff's purchase, he relied on GM's representations regarding the performance of the Subject Vehicle, including their representations that it featured "[a]dvanced technologies", an "optimized powertrain", and a "mantra" of "precision".

26.     Further Plaintiff relied on GM's representations that, with respect to its new vehicle warranty "[t]he complete vehicle is covered, including tires, towing to your nearest Chevrolet dealership and cosmetic corrosion resulting from defects. Repairs will be made to correct any vehicle defect".

### *Defects in the Subject Vehicle Go Unrepaired*

27.     Shortly after the purchase, Plaintiff began to have problems with the Subject Vehicle's performance.  For these problems, he returned the Z06 to authorized GM dealerships on or about eleven (11) occasions for about or around ninety-nine (99) days of service.  Attached to this Complaint as Exhibit "B" are copies of repair orders relating to these attempts to repair the Z06.  Plaintiff incorporates by reference the contents of these repair orders as if set forth completely herein.

28.     As described in the repair orders contained in Exhibit B, Plaintiff repeatedly presented the Z06 to authorized dealerships for repairs expressly related to the failure of the Z06's cooling system.

29.     Within two months from the date of delivery, on or about June 10, 2015, Plaintiff presented to the Subject Vehicle to Day's Chevrolet, located in Acworth, Georgia, with three complaints directly related to the engine cooling system.  Plaintiff described engine oil temperatures of approximately 320º F and coolant temperatures of approximately 260º F when the Z06 accelerated.  Further, Plaintiff described conditions to this GM authorized dealership,

which it described as consistent with the aforementioned "limp mode", wherein the Z06's engine drastically loses power and speed.

30.     Although the June 10, 2015 repair order represents that Day's Chevrolet could not duplicate these concerns, the repair order reflects that the Subject Vehicle was deposited by and returned to the Plaintiff with the same mileage – 1,843 miles. The high temperature at Hartsfield-Jackson International Airport ("ATL") on June 10, 2015 was 85º F.

31.     On or about August 5, 2015, Plaintiff returned the Subject Vehicle for cooling system service, with reports of the coolant temperature reaching 340º F and the vehicle reverting to "limp mode".  Again the authorized dealership claimed that it could not reproduce these issues.  The average temperature at ATL was 85º F.

32.     On or about November 9, 2015, Plaintiff returned to Day's Chevrolet with complaints that the Z06 continued to overheat and enter "limp mode"  Although GM's authorized dealership only drove the Subject Vehicle four (4) miles, it reported that its technicians could not reproduce the Plaintiff's concerns.  However, the dealership reported that GM would contact Plaintiff directly.  During the week of November 9, 2015, at ATL, the maximum high temperature was 74º F and the average high temperature was 61º F.

33.     Then, on or about August 3, 2016, Plaintiff presented the Subject Vehicle to Day's Chevrolet with concerns that the Z06 was "over heating while in stop and go traffic".  Further, Plaintiff reported that the warning "hot idle engine . . . would not clear even after letting [the] vehicle cool down."  GM's authorized dealership determined that the coolant pump was leaking and performed a replacement.  On August 3, 2016, the average temperature at ATL was 83º F.

34.     On or about August 8, 2016, the Plaintiff complained to Day's Chevrolet that

8

there was "a weird burning smell coming from the vehicle when hot" and a "rattle noise".

35.     On or about November 4, 2016, Plaintiff returned the Z06 to Day's Chevrolet for scheduled maintenance and again complained that the Subject Vehicle was reporting engine overheating while idle.  For a second time, the authorized dealership determined that the coolant pump was leaking and performed a replacement.  During the week of November 4, 2016, at ATL, the maximum high temperature was 86º F and the average high temperature was 73º F.

36.     On or about December 6, 2016, Plaintiff returned the Subject Vehicle to Day's Chevrolet with coolant pump issues for the third time.  Again, Day's Chevrolet performed a replacement.  During the week of December 6, 2016, at ATL, the maximum high temperature was 64º F and the average high temperature was 58º F.

37.     On or about March 8, 2017, Plaintiff returned to Day's Chevrolet with ongoing complaints of the Z06 overheating.  Although Day's Chevrolet could not "verify [this] concern at this time", its invoice reports that the Subject Vehicle was presented by and returned to Plaintiff with the same mileage – 11,548.  During the week of March 8, 2017, at ATL, the maximum high temperature was 76º F and the average high temperature was 63º F.

38.     Plaintiff returned the Z06 to Day's Chevrolet for service on or about June 1, 2017 with complaints of overheating.  The authorized dealership found evidence that the cooling system had boiled over.  During the week of June 7, 2017, at ATL, the maximum high temperature was 86º F and the average high temperature was 77º F.

39.     On or about July 5, 2017, Plaintiff returned the Z06 to Day's Chevrolet for repairs to the cooling system.  For a fourth (4th) time, the dealership replaced the coolant pump.  During the week of July 5, 2017, the average high temperature at ATL was 82º F.

40.     On or about April 6, 2018, Plaintiff presented his Z06 to Hardy Chevrolet Buick

GMC for repairs.  Hardy Chevrolet Buick GMC is a GM authorized dealership.  This GM dealer reported that the radiator surge tank leaked when the car was hot and replaced the radiator surge tank.  During the week of April 6, 2018, at ATL, the maximum high temperature was 81º F and the average high temperature was 69º F.

## COUNT I
## BREACH OF EXPRESS WARRANTY

41.     Plaintiff incorporates by reference the averments contained in the preceding and following paragraphs as if fully set forth herein.

42.     GM advertised that the 2015 Corvette Z06 was "the most capable model in the iconic car's 62-year history."  Its service materials claim that the Z06 "is designed to keep engine oil, coolant, transmission and differential fluids below the hot warning targets when driving . . . on a 30[º]C day (86[º]F) . . . for an indefinite period of time (effectively the time to burn through a full tank of fuel)."  These same materials claim that GM's "team validates the durability of the Z06 cooling systems with a 24hr accumulated track test to simulate the most aggressive track-day usage by our customers."

43.     As described herein, as part of the consideration for the contract price of the Z06, GM provided with the Subject Vehicle an express warranty.  *See* 2:18-cv-10601-VAR-APP, Dkt. 22-3.

44.     In its warranty, GM expressly commits "to ensuring satisfaction with [Plaintiff's] new vehicle."  *Id*. at 7.  Within the warranty, GM directs Plaintiff to take the Z06 to a GM authorized dealer for diagnosis and repair.  *Id*.  GM promised to repair any defect in the Subject Vehicle for the first 36,000 miles or within the first three (3) years after delivery.  *Id.* at 8.  Further, GM promised to cover any defect in the powertrain for the first 100,000 miles or five (5) years.  *Id*.

45.     In addition to these terms, under Georgia law, implied in every contract is "a duty of good faith and fair dealing in its performance."  *ULQ, LLC v. Meder*, 293 Ga. App. 176, 179 (2008).  Meaning that a party to a contract is required to "perform their promises . . . And, *where the manner of performance is left more or less to the discretion of one of the parties, [it] is bound to the exercise of good faith*."  *Id*. (quotation omitted)(emphasis in original).

46.     As described in greater detail herein, Plaintiff repeatedly presented his Z06 to GM authorized dealers with complaints of engine overheating.  Even though these dealers replaced components of the cooling system on multiple occasions, the defects persisted.

47.     Indeed, the Z06 overheated under the limited stress and strain of stop-and-go traffic.

48.     Beyond presenting the Subject Vehicle to authorized dealerships for repair, Plaintiff wrote to GM and notified them under Georgia law the he believed his Z06 was a lemon.  Attached to this Complaint as Exhibit "C" is a copy of Plaintiff's notification to GM.  Plaintiff incorporates by reference this correspondence into this Complaint as it fully set forth herein.

49.     By this notification, he gave GM the opportunity to repair or repurchase the Subject Vehicle.  GM declined to do so.  In other words, GM failed to honor the terms of the warranty.

50.     Despite over eleven opportunities to fix the Subject Vehicle or replace it with a conforming Z06, GM failed to do so.  As such, GM breached the terms of the express warranty and the implied covenant of good faith and fair dealing.

51.     As a result of GM breaches, Plaintiff has suffered incidental and consequential damages.

WHEREFORE, Plaintiff respectfully seeks the relief set forth below.

## COUNT II
## <u>BREACH OF IMPLIED WARRANTY</u>

52.     Plaintiff hereby incorporates by reference the averments of preceding and following paragraphs hereof as if fully set forth herein and further allege as follows:

53.     Every Z06 sold in the State of Georgia is subject to the implied warranties of merchantability found at O.C.G.A. § 11-2-3-314.  These implied warrantied include:

    A.     that the Z06 was fit for the ordinary purpose of safe, reliable transportation;

    B.     that the Z06 was of good, sound, and merchantable quality;

    C.     that the Z06 was free from defective parts and workmanship;

    D.     that any defects or non-conformities in the Z06 would be cured within a reasonable time.

54.     As described herein, Plaintiff's Z06 do not conform to these warranties because, among other issues, it overheats in stop-and-go traffic.  GM has failed to or otherwise refused to repair the defects present in the Z06's cooling system.

55.     Plaintiff has provided GM with over eleven (11) opportunities to repair the Subject Vehicle, which kept the Z06 out of service for about or around 99 days.  As such, GM has had more than a reasonable opportunity to repair or replace the Subject Vehicle

56.     As a direct and consequential result of GM's breach of these implied warranties, Plaintiff has and continues to suffer damages in an amount to be proved at trial.

    WHEREFORE, Plaintiff respectfully seeks the relief set forth below.

## COUNT III
## <u>VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT</u>

57.     Plaintiff hereby incorporates by reference thereto the averments of foregoing paragraphs hereof as if fully set forth herein and further allege as follows.

58.     The Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.* empowers consumers to seek judicial enforcement of warranties against manufacturers like GM. Pursuant to section 2310(d) of the MMWA, consumers may seek judicial enforcement of warranties and damages, including attorneys' fees and costs, flowing from breaches of warranties by suppliers and warrantors.

59.     Plaintiff is a consumer within the ambit of the MMWA because he purchased the Subject Vehicle, a "consumer product" within the meaning of § 2301(1), with a written warranty, within the meaning of § 2301(6), and implied warranties, within the meaning of § 2301(7), for purposes other than resale, and are entitled to enforce these warranties against the "warrantor", within the meaning of § 2301(5).

60.     Defendant is a "supplier", within the meaning of § 2301(4), and a "warrantor", within the meaning of § 2301(5), because Defendant is in the business of manufacturing motor vehicles, "consumer product[s]" within the meaning of § 2301(1), and offering them to "consumer[s]", within the meaning of § 2301(3), with "written warrant[ies]", within the meaning of §2301(6), and "implied warrant[ies]", within the meaning of § 2301(7).

61.     The Subject Vehicle is a "consumer product", within the meaning of § 2301(1), because the Chevrolet Corvette Z06 is tangible property marketed and sold, in and amongst the several states, for personal, family or household purposes.

13

62.     Pursuant to section 2304(d), GM was required to remedy any defects, malfunction, or non-conformance of the subject vehicle within a reasonable time and without charge to Plaintiff.

63.     As described in greater detail herein, by failing to repair or replace the Subject Vehicle, GM defaulted on its obligations under its written warranty and the warranties imputed to it by Georgia law.  By breaching its express and implied warranties it violated the MMWA.

64.     Plaintiff has repeatedly requested that GM repair or replace the Subject Vehicle. Plaintiff has complied with every condition of GM's warranties imposed upon him. Nevertheless, GM has refused to honor its obligations, repair the defects present in the Subject Vehicle, or replace the Subject Vehicle with a conforming Z06.

65.     As a result of GM's breaches, Plaintiff has, and will continue to suffer damages, resulting from the loss of use of the Subject Vehicle and the diminution of the Subject Vehicle's value.

66.     As described herein, GM has had over 11 reasonable opportunities to cure these defects, but has failed to do so.  Accordingly, the provisions of the MMWA entitle Plaintiff to a refund of the purchase price.

67.     Pursuant to section 2310(d)(2) of the MMWA, Plaintiff is entitled to recover the costs of this lawsuit, including attorneys' fees.

68.     WHEREFORE, Plaintiff respectfully seeks the relief set forth below.

### COUNT IV
### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

69.     Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows:

70.     The Georgia Fair Business Practices Act ("FBPA"), O.C.G.A. § 10-1-390, *et seq.*, outlaws unfair and deceptive practices in consumer transactions.  The purpose of the FBPA is "to protect consumers . . . from unfair or deceptive practices in the conduct of . . . commerce" O.C.G.A. § 10-1-391(a).  The Georgia legislature intended that the FBPA should "swiftly stop" these practices and to that end prescribed that the FBPA "shall be liberally construed and applied to promote its underlying policies and purpose."  *Id.*  Under the FBPA, it is unlawful to "[r]epresent[] that goods or services are of a particular standard, quality or grade . . . if they are of another".  O.C.G.A. § 10-1-393(7).  Further it is unlawful to represent "that goods have . . . characteristics . . . uses, benefits, or qualities that they do not have".  O.C.G.A. § 10-1-393(5). Finally, it is unlawful to advertise "goods . . . with the intent to tell them not as advertised." O.C.G.A. § 10-1-393(9).

71.     Plaintiff is a consumer within the meaning of the FBPA because he is a natural person.

72.     The sale and purchase of the Z06 is a consumer transaction within the meaning of the FBPA because it involves the "sale [and] purchase . . . of goods, services, or property . . . primarily for personal, family or household purposes."  O.C.G.A. § 10-1-392(10).

73.     GM committed an intentional violation of the FBPA within the meaning of the FBPA because GM knew that representing that the Z06 could not perform as advertised was a violation of the FBPA.

74.     On information and belief, Plaintiff avers that GM's legal department or function is of the FBPA and the type of conduct that will violate it.  Further, on information and belief, Plaintiff avers that GM's legal department or function engages in the review and monitoring of marketing material to ensure it conforms with applicable federal and state laws.

15

75.     As described in greater detail herein, GM represented that the Z06 was superior to any Corvette that had come before.  Further, it represented that the Z06 could operate, without any decrease in performance or function, when the outdoor temperature was 86ºF.  Plaintiff received representations regarding the quality of the Z06 before, during, and after his purchase of the Z06.  The approximate dates he received these representations are set forth herein or are appended hereto as Exhibits to this Complaint.  He reasonably relied on the representations made by GM and its authorized agents.

76.     As described in greater detail herein, Plaintiff's Z06 failed to live up to these representations.  Rather, its cooling system succumbed to rigors not of the 24-hour Le Mans race, but from mere stop-and-go driving.  As such, the Z06 does not conform to GM's representations.

77.     Further, on information and belief, through testing, GM discovered that the Z06 could not be manufactured in a manner that would allow it to conform to GM's representations.  As such, GM marketed and sold the Z06 with the intent to supply a product that did not conform to its marketing.

78.     Moreover, as described herein, GM led Plaintiff to believe that Z06 had been repaired and was now conforming.  This turned out to be untrue.  Despite Plaintiff giving GM eleven (11) opportunities to repair the Subject Vehicle, GM was unable to conform the vehicle to its representations.  Yet, GM insisted that the Subject Vehicle conformed.

79.     Together, these circumstances constitute violations of the FPBA, from which Plaintiff has and continues to suffer damages.

80.     O.C.G.A. § 10-1-399 empowers individuals, like Plaintiff, to seek injunctive relief and to recover general damages sustained by virtue of GM's violation of the FBPA.  Because GM committed an intentional; violation of the FBPA, Plaintiff is empowered to seek exemplary

damages.  Further section 10-1-399(d), allows the court to award Plaintiff the costs of this litigation, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the relief set forth below.

## COUNT V
## <u>UNJUST ENRICHMENT/OPPORTUNISTIC BREACH OF CONTRACT</u>

81. Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows:

82. By engaging in the conduct described in this Complaint, the GM has knowingly obtained benefits from Plaintiff, namely revenue from the purchase of the Subject Vehicle and the profits therefrom, which are actual monies and other benefits under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

83. By engaging in the acts and failures to act described in this Complaint, GM has been knowingly enriched by the savings in costs that should have been reasonably expended to repair the defective Z06 or to manufacture the Z06 in a manner that would conform to GM's representations regarding the car. Gm was on notice that the Z06 could overheat, yet they failed to take reasonable steps to remedy the overheating issues.

84. Thus, GM will be unjustly enriched if they are permitted to retain the benefits derived from their failure create a product that conformed to their design and marketing.

85. A claim for opportunistic breach provides recourse for conscious advantage taking or opportunistic calculation that leads to some gain exceeding the injury from the breached contract.  Here GM has been enriched beyond the monetary damages to Plaintiff and it would be unjust for the Defendants to retain those benefits.  *See Kansas v. Nebraska,* ___ U.S. ___, 235 S. Ct. 1042, 1069 (2015)(Thomas, J. dissenting); Restatement (third) of Restitution and Unjust Enrichment § 39(3) & cmt. f.

17

86.     GM was unjustly enriched in two ways.  First, GM accrued savings by failing to properly ensure that the Z06 was manufactured in a manner that conformed with its marketing. Second, they accrued cost savings by failing to adequately repair the Subject Vehicle.

87.     Plaintiff is therefore entitled to compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

WHEREFORE, Plaintiff respectfully seeks the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court to enter the following relief:

A.     Declare Plaintiff's vehicle to defective and declare GM's conduct to have violated its express and implied warranties.

B.     Declare unlawful the acts and practices alleged herein, and enjoin GM from committing the acts alleged herein;

C.     Enter judgment against GM for the violations alleged herein;

D.     Award the actual and consequential damages incurred by Plaintiff as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

E.     Award statutory damages set forth herein;

F.     Award of treble damages or multiple damages by operation of law;

G.     Award exemplary or punitive damages;

H.     Award Plaintiff the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees; and

I.     Award such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

LEMON LAW GROUP PARTNERS, PLC

/s/ Edward L. Ewald, Jr.
Edward L. Ewald, Jr. (P43751)
Attorneys for Plaintiff
48660 Pontiac Trail, #930792
Wixom, MI 48393
(313) 510-3329
Fax (248) 856-2247
edwardewald@comcast.net

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable in this cause.

Respectfully submitted,

LEMON LAW GROUP PARTNERS, PLC

/s/ Edward L. Ewald, Jr.
Edward L. Ewald, Jr. (P43751)
Attorneys for Plaintiff
48660 Pontiac Trail, #930792
Wixom, MI 48393
(313) 510-3329
Fax (248) 856-2247
edwardewald@comcast.net

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 28, 2019, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

all counsel of record.

I further certify that I emailed the foregoing document and the notice of electronic filing by first-

class mail to the following non-CM/ECF participants: N/A

*/s/Edward L. Ewald, Jr.*

Edward L. Ewald, Jr. (P43751)
Attorney for Plaintiff
48660 Pontiac Trail #930792
Wixom, MI  48393
313.510.3329
248.856.2247 fax
edwardewald@comcast.net
